## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **PAMELA WHITE, as Administratrix** *Ad Prosequendum of the Estate Of Phillip George White, et al.,*<br><br>*Plaintiffs,*<br><br>v.<br><br>**CITY OF VINELAND et al.,**<br><br>*Defendants.* | **Case No. 1:16-cv-08308-JDW-KMW** |

## <u>MEMORANDUM</u>

After an encounter with Vineland police officers, Philip White died on the way to the hospital. On that much, the parties to this case agree. But on just about everything else, they disagree. Witnesses, including police officers and civilians, offer competing versions of what occurred. They differ on what precipitated Officer Louis Platania to direct force against Mr. White; they differ on how much force he used; they differ on whether Mr. White threatened or resisted Officer Platania; and they differ on whether Mr. White was conscious or unconscious during and after the encounter. Expert witnesses even disagree about whether Mr. White died from asphyxiation or from taking PCP.

Defendants seek summary judgment, and to avoid a trial, based on their version of events. They attack witnesses' credibility, they spin certain facts, and they ignore unhelpful testimony. None of that is allowed in a motion for summary judgment. With more than a dozen potential witnesses, inconclusive video footage, and dueling experts, this case is the prototype of a case that needs a trial. With limited exceptions

discussed below, the Court denies Defendants' summary judgment motion and leaves the resolution of these issues to a jury.

## I.  FACTUAL BACKGROUND

### A.  The Incident

The parties have submitted differing witness testimony about what happened, as well as two videos that record part of the incident. The witness testimony is so divergent that the Court has had a hard time reconstructing a timeline, even with the help of video evidence. The Court therefore provides a factual recitation that is consistent with the videos, to the extent those videos are clear, and that resolves other factual disputes in Plaintiffs' favor.

On March 31, 2015, Officers Platania and Richard Janasiak responded to a call about a black male screaming in the street in Vineland, New Jersey. Officer Platania arrived first and saw a group of three to four men standing next to a driveway. Mr. White was nearby, leaning on a fence with his back to the men, possibly hyperventilating. Some witnesses say that Mr. White was involved in an altercation, but other witnesses disagree. At least one person present, Luis Martinez, told Officer Platania that there was no argument.

Officer Platania approached Mr. White from behind and grabbed Mr. White's arm. He did not announce himself as a police officer. He asked Mr. White if Mr. White needed an ambulance, and Mr. White initially agreed. But then Mr. White began to move away, all without looking at Officer Platania. He moved into the street, and Officer Platania followed. Around this time, Officer Janasiak arrived. He and Officer

Platania say that Mr. White began to hit Officer Platania's police cruiser, which had a K-9 unit in the back seat. Other witnesses dispute that.

At some point, Officer Platania announced himself as a police officer. He then grabbed Mr. White in a "bear hug" and slammed Mr. White into a car. (D.I. 34-2 at 31:8-33:16.) Some witnesses say that Mr. White resisted and tried either to punch or kick one of the officers. Other witnesses disagree. Mr. White then fell from the trunk of the car onto the ground. After Mr. White hit the ground, witnesses testified that he was either unconscious or barely conscious.

Once Mr. White was on the ground, Officers Platania and Janasiak report that Mr. White was reaching for Officer Platania's gun. Other witnesses dispute that account. There is video of the incident that begins after Officer Platania had taken Mr. White to the ground, but it is not clear from the video whether Mr. White was reaching for Officer Platania's gun. Mr. White was initially on his stomach. Officer Platania called for the K-9 unit. Officer Janasiak released the dog, and Officer Platania directed it to attack Mr. White. Mr. White rolled onto his back (or was rolled onto his back), and the video shows him putting up only small resistance. The officers then rolled him back onto his stomach and put handcuffs on him. Officer Platania was squatting above Mr. White, but he does not appear to put his body weight on Mr. White. Several witnesses testified that Mr. White lost consciousness, though some witnesses said Mr. White was resisting arrest. (At least one witness said both at different times.)

At some point after handcuffing Mr. White, officers attempted to place him in the back seat of a police car. Here again, witnesses disagree about what happened. Some witnesses say that Mr. White sat upright on the pavement. Others say that Mr.

3

White sat up only with help. Still others say that Mr. White was unconscious and never sat up. Some witnesses say that Mr. White resisted officers' efforts to place him in the police car. Others say that Mr. White was not moving. For present purposes, the Court concludes that Mr. White was unconscious and did not resist the officers' efforts to place him in the car.

Eventually, EMS technicians placed Mr. White on a stretcher and in an ambulance. Mr. White stopped breathing in the ambulance, and doctors pronounced him dead when he arrived at the hospital. The medical examiner concluded that Mr. White's death was accidental, as a result of phencyclidine (*i.e.*, PCP) intoxication. On the other hand, Plaintiff's expert Dr. Michael Baden concluded that the cause of Mr. White's death was "[r]espiratory and cardiac arrests during police restraint. (Restraint death)." (ECF No. 67-1 at 8.)

### B.    History Of Complaints In Vineland

This was not the first time that Vineland police officers, including Officer Platania, used force in a way that led to a civilian complaint. Between 2009 and 2014, the Vineland Police Department received 190 complaints about the use of excessive force. The Department investigated 185 of those complaints and sustained none. From January 1, 2009, until March 31, 2015, there were 45 internal affairs complaints against Officer Platania, including 17 alleging excessive force. These included seven complaints, including four alleging excessive force, between May 2013 and March 2015. The Department did not sustain any of those complaints. Vineland's Police Chief Timothy Codispoti was aware of the complaints against Officer Platania.

The Department's Internal Affairs Department ("IA") had responsibility for investigating civilian complaints, including about the use of force. Several of IA's investigations appear to have been lacking. In at least six, including four involving Officer Platania, IA only interviewed police officers, not civilian witnesses, before reaching its conclusion. When IA investigated Officers Platania and Janasiak in connection with Mr. White's death, it interviewed police officers and EMS personnel, but it did not interview any civilian witnesses.

### C.   Procedural History

Mr. White's mother Pamela, acting as Administratrix *Ad Prosequendum* of Mr. White's estate, and Mr. White's children Iyonna Hannah and T.H. (a minor), filed this action on November 7, 2016. They asserted claims against Officers Platania and Janasiak, Chief Codispoti, and the City of Vineland. They filed an Amended Complaint on October 24, 2018, and on November 5, 2018, they voluntarily dismissed their claims against Officer Janasiak. The Amended Complaint asserts (a) claims under 42 U.S.C. § 1983 for excessive force, false arrest, failure to intervene, supervisory liability on the part of Chief Codispoti, and municipal liability on the part of the City, (b) a claim under 42 U.S.C. § 1981, and (c) various claims under state statutes. On August 23, 2019, Defendants filed a summary judgment motion, which is now ripe for decision.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). Where there is video footage related to the claims, the Court must not draw inferences that are "blatantly" inconsistent with the video evidence. *Id*. at 380-81. However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted).

## III. ANALYSIS

### A. Preliminary Matters

#### 1. Defendants' commentary on the Plaintiffs

In both their statement of facts and their brief, Defendants attack the three plaintiffs, Mrs. White and her two grandchildren. They point out that none of the plaintiffs has personal knowledge about the incident. That fact is true but irrelevant. None of them was there, but that does not change their standing to pursue their claims. Nor does it lessen their grief at the loss of a loved one. Mrs. White's status highlights the absurdity of Defendants' approach. Mrs. White is not participating in this case in her personal capacity. She is participating as a representative of her son's estate. She

does not have personal knowledge because the personal knowledge about the incident died with her son. Defendants' criticism of her lack of personal knowledge—in a case in which she complains that the knowledge died with her son because of police misconduct—is a bold display of chutzpah.

Defendants double-down on their tone-deaf attitude about Mrs. White by including a litany of facts to attack Mr. White's character and Mrs. White's involvement with her son's life, and to hint that Mrs. White is not controlling this lawsuit. Defendants do not rely on any of those facts in any of their summary judgment arguments. That's not surprising because they have nothing to do with anything in the motion. Defendants' gratuitous inclusion seems like an attempt to poison the Court or the public (who Defendants might think are following this case). Defendants and their counsel should know better. Going forward, the Court does not expect to see the use of such inflammatory, irrelevant facts in motions practice (or otherwise)—either in this case or any other.

### 2.    The videos and still frames

The Supreme Court has explained that, where a video of an incident exists, the Court cannot disregard that video and credit witnesses who offer competing versions of events. *See Scott*, 550 U.S. at 379-80. The decision only applies if the video blatantly contradicts a plaintiff's version of events. *See El v. City of Pittsburgh*, 975 F.3d 327, 333 (3d Cir. 2020); *Patterson v. City of Wildwood*, 354 F. App'x 695, 697-98 (3d Cir. 2009). Defendants invoke this rule to argue that the Court should credit their version of events. The Court will not do so.

Contrary to Defendants' claims, the videos do not offer a conclusive version of events. The videos begin with Mr. White on the ground, Officer Platania on Mr. White's back, and Officer Janasiak in the area. One video begins as the officers release the K-9 unit, the other begins after the dog has been restrained. Neither video reveals anything about how Mr. White wound up on the ground with two officers and a K-9 using force to restrain him. The videos end with Mr. White on his back, with additional officers arriving on the scene. They therefore do not show what happened after Mr. White was restrained. They do not reveal whether Mr. White resisted the officers' efforts to place him in a police car, whether he sat upright on the curb after the officers handcuffed him, or how he acted when the EMTs placed him in an ambulance.

Even the footage on the videos is not conclusive. It shows the officers restraining Mr. White and the K-9 unit engaging Mr. White. Mr. White does not appear to be violent, but it is unclear whether he is resisting. His arm raises at one point, apparently in the dog's jaw, but it is not clear whether the arm is limp. Nothing in the video shows whether Mr. White reached for Officer Platania's weapon.

The still photos that Defendants pulled from the videos reveal even less. Although Defendants posit that the photos reveal Mr. White reaching for Officer Platania's gun, they are not nearly so clear. A review of the still photos leaves open as many questions as it answers, if not more. Even Defendants admit that "White's hand cannot be made out/seen to be gripping the weapon." (D.I. 69 at 6.) The fact that Mr. White's arm is off the ground is not enough to infer that he was reaching for Officer Platania's gun, particularly when the Court must give the benefit of all inferences to the Plaintiffs. In addition, the Court is mindful that a still photo is just a frozen moment

8

in time. It must be viewed in context. In context, with the benefit of the full video, the Court does not deem the photos or the videos conclusive.

Because the videos and photos are not conclusive, the Court cannot rely on them to contradict witness testimony that is in Plaintiffs' favor. For the claims that survive summary judgment, a jury will have to decide what to make of the footage, amongst the other evidence that will be presented.

### B.   Federal Claims

#### 1.   Section 1983 claims against Officer Platania

Section 1983 provides a "civil remedy for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Halsey v. Pfeiffer*, 750 F.3d 273, 290 (3d Cir. 2014) (quoting 42 U.S.C. § 1983)). To state a claim under Section 1983, a plaintiff must show that "'some person has deprived him of a federal right . . . [and] that the person who has deprived him of that right acted under color of state or territorial law.'" *Id.* (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (alteration in original)). Plaintiffs assert claims under Section 1983 against Officer Platania in his individual capacity on three theories: (a) excessive force; (b) false arrest; and (c) failure to intervene.

##### a.   Excessive force

###### i.   Merits of the claim

Police officers are privileged to commit a battery pursuant to a lawful arrest, but the privilege is negated by the use of excessive force. *See Groman v. Twp. of Manalpan*, 47 F.3d 628, 634 (3d Cir. 1995). Force is excessive when it is objectively unreasonable based on the totality of the circumstances. *See id.* To make that

determination, courts look to a number of factors, including: the facts and circumstances of each particular case; the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; whether he is actively resisting arrest or attempting to evade arrest by flight; the duration of the action; whether the action takes place in the context of effecting an arrest; the possibility that the suspect might be armed; and the number of persons with whom an officer must contend at one time. *See Graham v. Connor*, 490 U.S. 386, 396-97 (1989); *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).

Plaintiffs have evidence that Officer Platania used excessive force against Mr. White. At the time that Officer Platania took Mr. White to the ground, Mr. White had not committed a crime, at least according to the witnesses who said he did not hit the police car. Nor had he done anything to threaten Officer Platania or anyone else. He did not actively resist arrest, either before Officer Platania took him to the ground or after. There is no evidence that Mr. White was armed. While Defendants contend that Mr. White was reaching for Officer Platania's gun, the evidence on that point is not conclusive, and the Court therefore assumes he was not. Although there were several people on the scene, there is no evidence that any of them engaged with or threatened the officers. In fact, the videos show that while they yelled to the officers, they stayed out of the way. In short, Mr. White did not commit a crime or resist arrest, either before Officer Platania took him to the ground or after. A reasonable juror could therefore conclude that Officer Platania's use of force was excessive.

Defendants' arguments to the contrary rely on their factual narrative, which the Court cannot credit. They argue that Mr. White died from a PCP overdose, rather

than from asphyxiation. But that is a disputed issue of fact that the Court cannot resolve in their favor. They argue that the asphyxiation was accidental, but if Officer Platania put his legs and knees on Mr. White's chest and throat intentionally, then it does not matter that Officer Platania did not intend to cause asphyxiation. His use of force was intentional, and it led to that result. Finally, Defendants dismiss the other injuries that Mr. White suffered, including punches and dog bites, as "superficial." (D.I. 58-1 at 11.) But a police officer cannot use force even to cause superficial injuries without justification. Officer Platania had no justification, so his use of force was excessive.

Defendants' contention that Mr. White tried to grab Officer Platania's gun highlights the error of their approach. Defendants weave together a narrative based on still frames from the videos and Officer Platania's testimony to a grand jury. (D.I. 69 at 5-7.) Then, in an effort to have the Court adopt their version of events, they attack the credibility of witnesses who tell a different tale. (*Id.* at 12-13.) Defendants' approach flies in the face of the standard for summary judgment. A jury will decide whether to accept Defendants' version of events.

### ii.   **Qualified immunity**

Qualified immunity "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Courts should not "define clearly established law at a high level of generality." *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 716 (3d Cir. 2018). A court need not identify a case directly on point for a right to be clearly established,

11

but "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S.Ct. 548, 551 (2017). As an affirmative defense, the burden of establishing qualified immunity falls on to the official claiming it. *See Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 176 (3d Cir. 2011).

To determine if an officer's conduct is entitled to qualified immunity, courts ask two questions: (1) whether the defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was clearly established when the conduct took place. *Sauers*, 905 F.3d at 716. In assessing a claim of qualified immunity, like any other aspect of a summary judgment ruling, the court must not resolved genuine disputes of fact in favor of the moving party; instead, it must decide whether the facts taken in the light most favorable to the non-moving party take the case to a place where the law is not clearly established. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*).

Defendants do not argue that, if the Court accepts Plaintiffs' version of events, that they are entitled to qualified immunity. Instead, they claim qualified immunity because there was "no evidence or testimony to dispute Platania's observations" and because his actions were "objectively reasonable." (D.I. 58-1 at 15.) But there is evidence that disputes Officer Platania's version of events, and the Court must accept that evidence as true. That evidence undermines Defendants' qualified immunity argument.

### b.   **False arrest**

### i.   **Merits of the claim**

To determine whether a false arrest occurred, courts ask whether a reasonable officer would think there is probable cause at the time of arrest. *See Andrews v. Scuilli*, 853 F.3d 690 (3d Cir. 2017) (citing *Blaylock v. City of Philadelphia*, 504 F.3d 405 (3d Cir. 2007)). Probable cause exists when the facts and circumstances within the arresting officer's knowledge are enough in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested. *See Ciriedello v. Sexton*, 390 F. App'x 193, 199 (citing *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir.1995)). An arrest is lawful if there is probable cause for "any offense that could be charged under the circumstances," and the fact that a person is not ultimately charged with the offense supplying probable cause is irrelevant. *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005).

Defendants concede that Officer Platania arrested Mr. White at least as early as the moment that Officer Platania took Mr. White to the ground. At that time, Mr. White had not done anything that might have justified an arrest. Defendants' argument to the contrary rests on their version of events. Defendants argue that Mr. White punched the police car and "thr[ew] karate kicks" at the officers. (D.I. 58-1 at 24.) But other witnesses dispute that testimony, and the Court must credit those alternative versions of the events. Those versions establish that Officer Platania had no basis to arrest Mr. White when he first effected an arrest.

13

### ii.    **Qualified immunity**

No one disputes that an officer cannot arrest a citizen without probable cause to do so. There was no legal gray area about this at the time of the arrest. Defendants claim that Officer Platania is entitled to qualified immunity "so long as he had a reasonable belief in probable cause for the arrest." (*Id.* at 25.) But that's the standard to determine whether he had a basis to effect an arrest. Being in a factual gray area does not create qualified immunity; it creates a disputed issue of fact for the jury. Officer Platania would have to be in a legal gray area about whether certain conduct permitted an arrest in order to invoke qualified immunity. He has not pointed to any such dispute.

### c.    **Failure to intervene**

To be liable under a failure to intervene theory, the plaintiff must have demonstrated that his underlying constitutional rights were violated, that the officer had a duty to intervene, and that the officer must have had a realistic and reasonable opportunity to intervene. *See Smith v. Mensinger*, 293 F.3d 641, 650-51 (3d Cir. 2002). In general, an officer who is in the vicinity when a constitutional violation occurs has the opportunity to intervene, at least for purposes of summary judgment. *See id.* at 650 ("[A]ll of the named officers were in the vicinity at some point when Smith alleges he was beaten.").

Plaintiffs contend that Officer Janasiak used excessive force. When the Court views the events in the light most favorable to Plaintiffs, that is true. Officer Platania, in turn, was in the vicinity when Officer Janasiak used that force, meaning Officer

14

Platania had an opportunity to intervene. He did not. His potential liability does not change just because he was also using force.

### 2. Section 1983 claims against the City

A plaintiff that pursues a claim of municipal liability under Section 1983 may proceed in two ways. He may "put forth that an unconstitutional policy or custom of the municipality led to his . . . injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (cleaned up). The two avenues "remain distinct: a plaintiff alleging that a policy or custom led to his or her injuries must be referring to an unconstitutional policy or custom, and a plaintiff alleging failure-to-supervise, train, or discipline must show that said failure amounts to deliberate indifference to the constitutional rights of those affected." *Id.* at 106.

In *Forrest*, the Third Circuit noted the possibility that a plaintiff could pursue a claim for a "policy or custom of permitting excessive force, false arrest, or other constitutional violations" that lead to a plaintiff's injuries. *Id.* at 107; *see also Beck v. City of Pittsburgh*, 89 F.3d 966, 967 (3d Cir. 1996) (question in case was what is sufficient evidence from which a jury can infer that a municipality adopted a custom of permitting its police officers to use excessive force). Alternatively, a plaintiff can pursue that as a failure by the municipality. In their Motion, Defendants express some confusion about which avenue Plaintiffs are pursuing against them. The Amended Complaint is somewhat unclear. Rather than wait until summary judgment, Defendants could have clarified the nature of the claim in discovery, including through the use of interrogatories. In any event, Plaintiffs' opposition argues only that the City had a

15

custom. It never mentions a failure or inadequacy on the City's part. The Court will therefore treat the municipal liability claim as a claim that the City had a custom of permitting excessive force and false arrest.

To prove a custom, a plaintiff must show "that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019). A factfinder can infer that a police officer has a propensity for violence when making arrests from a history of complaints against that officer, even if the complaints are not sustained. *See Beck*, 89 F.3d at 973-74. A plaintiff must also show that the custom was the proximate cause of his injuries.

Plaintiffs have evidence to support their clam that the City had a custom of permitting officers to use excessive force. The evidence, taken in the light most favorable to the Plaintiffs, shows that the City received 45 complaints about Officer Platania, including 17 involving allegations of excessive force. Although investigators did not sustain any of those investigations, Plaintiffs have evidence suggesting that the investigations were incomplete, at best. The Third Circuit has explained that having an investigative process in place does not protect against municipal liability unless the investigative process is real. *Id.* A reasonable juror could conclude that the City's process was not real.

Defendants ask the Court to disregard these incidents because they are not sufficiently factually similar to the case at hand. Defendants' argument, for purposes of a summary judgment motion, are too granular. Often, Defendants rely on the fact that other incidents did not involve the use of a police dog, but that is not the only

basis on which Plaintiffs assert the excessive use of force. The Court rejects Defendants' invitation to weigh the evidence. A reasonable juror could conclude from the history of complaints about Officer Platania specifically and other officers more generally that the City had a custom of permitting officers to use excessive force. Contrary to Defendants' argument, the Third Circuit's decision in *Forrest* does require the Court to parse the complaints. It stands only for the unremarkable proposition that the incidents to which a plaintiff points must be of a "similar nature" to the incident at issue and close enough in time. *See Forrest*, 930 F.3d at 115. Plaintiffs have made that showing when the evidence is viewed in the light most favorable to them. Defendants can argue about distinctions in the past complaints, and about their import, to the jury, which is the forum for weighing of evidence.

The outcome is different for Plaintiffs' false arrest claim, however. The incidents on which Plaintiffs base their claims are complaints about excessive force. They have not pointed the Court to a history of complaints about false arrests. They therefore fail in their burden to identify evidence from which a reasonable juror could conclude that the City has a custom of tolerating false arrests by its officers.

### 3.    Section 1983 claims against Chief Codispoti

The claims against Chief Codispoti in his individual capacity break the same way as the claims against the City. There are two ways of imposing supervisory liability under Section 1983. A supervisor can face Section 1983 liability if, "with deliberate indifference to the consequences, [he] established and maintained a policy, custom, or practice which directly caused the constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Or he can face

liability if he "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *Id.* Plaintiffs argue for the first type of supervisory liability.

To prove such a claim, a plaintiff "must (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk[,] and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure." *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001). It is not enough for a plaintiff to argue just that the supervisor should have done more than he did. Instead, he must "identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a relationship between the identified deficiency and the ultimate injury." *Id.*

Plaintiffs have satisfied that burden. They have evidence that Chief Codispoti knew that IA did not conduct full, complete investigations of civilian complaints concerning the excessive use of force, and he did not correct that failure. He also knew about a history of complaints against Officer Platania. A reasonable juror could conclude that the custom of permitting excessive force without more fulsome IA investigations created a risk that an officer would injure or kill a citizen. Chief Codispoti was aware of that risk. A reasonable juror could conclude that he turned a blind eye to it and that Officer Platania's use of force resulted from it. Thus, Plaintiffs

have evidence of all of the elements of a claim against Chief Codispoti relating to Officer Platania's excessive use of force.

On the other hand, Plaintiffs do not have evidence that Chief Codispoti was aware of any sort of pattern of false arrest claims or that he established or tolerated a custom of permitting false arrests. The Court will therefore grant summary judgment as to that aspect of the claims against Chief Codispoti.

### 4. Conspiracy to violate civil rights

Plaintiffs concede this claim in their Opposition. The Court will therefore grant Defendants' Motion.

### 5. Section 1981 claims

Section 1981 secures for all citizens the right to "make and enforce contract, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981. Although Plaintiffs assert this claim, they do not argue in its favor in their summary judgment opposition. Nor is there any evidence in the record to support claim of race-based discrimination, among other problems. The Court will grant Defendants' Motion as to this claim.

### C. State Claims

### 1. NJCRA

The NJCRA is co-extensive with Section 1983. *See Hottenstein v. City of Sea Isle City*, 977 F. Supp.2d 353, 365 (D.N.J. 2013). So the Court's analysis of this claim is the same as its analysis of the Section 1983 claims.

### 2. NJLAD

Plaintiffs concede this claim in their Opposition.

### 3. Tort claims

In Counts Nine and Ten of the Amended Complaint, Plaintiffs assert claims for wrongful death and survivorship under New Jersey state law. But in their Opposition to the Motion, they say that they "do not pursue tort actions under the New Jersey Wrongful Death Statute or the Survival Statute." (D.I. 64 at 86.) As best the Court can understand, Plaintiffs say that they are not bringing free-standing tort claims under these statutes, but they are invoking them to establish that Mr. White's Section 1983 claims survived his death. *See Robertson v. Wegmann*, 436 U.S. 584, 589 (1978) (state survivorship law governed survival of Section 1983 claim). Defendants, however, have not claimed otherwise.

It is not clear that the parties have a dispute about this. They seem to be talking past each other. To the extent there is a dispute, Plaintiffs can pursue Mr. White's Section 1983 claims because New Jersey's survivorship statute permits a claim for personal injury to survive the injured party's death. *See* N.J. Stat. Ann. § 2A:15-4; *Friedland v. Fauver*, 6 F. Supp.2d 292, 312 (D.N.J. 1988). They cannot pursue tort claims under New Jersey law for wrongful death or survivorship because they did not comply with the notice requirement for those claims. *See* N.J. Stat. Ann. § 59:8-8.

## IV. CONCLUSION

Juries are the bedrock of the American justice system. When parties have factual disputes, they present those disputes to a jury of their peers for resolution. The

factual disputes here require a jury trial to resolve. Therefore, the Court will deny

Defendants' motion, except as set forth above. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
HON. JOSHUA D. WOLSON
United States District Judge

November 12, 2020